# EXHIBIT A

EXHIBIT A

SUM-100

# SUMMONS
## (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**Electronically FILED by Superior Court of California, County of Los Angeles 8/13/2024 3:15 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Salcedo, Deputy Clerk**

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
Zoll Medical Corporation, a Massachusetts corporation; and DOES 1 through 100,
inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
Gregory Kazdoba, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡**AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (*www.sucorte.ca.gov*), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (*www.lawhelpcalifornia.org*), en el Centro de Ayuda de las Cortes de California, (*www.sucorte.ca.gov*) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
VAN NUYS COURTHOUSE WEST
14400 ERWIN STREET MALL
VAN NUYS, CA 91401

CASE NUMBER:
*(Número del Caso):*
24VECV03878

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Rotem Tamir, Esq., Bluestone Law, 7012 Owensmouth Ave., Second Floor, Canoga Park, CA 91303
(310) 363-0975

DATE: August 13, 2024 08/13/2024
*(Fecha)*

Clerk, by *(Secretario)* A. Salcedo, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☒ on behalf of *(specify)*: Zoll Medical Corporation, a Massachusetts corporation

   under: ☒ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
   ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

ROTEM TAMIR, SBN 328968
E-Mail rotem@bluestone.law
HARRISON WHEELER, SBN 351321
E-Mail hwheeler@bluestone.law
**BLUESTONE LAW**
7012 Owensmouth Ave, Second Floor
Canoga Park, CA 91303
Telephone: (310) 363-0975

Attorneys for Plaintiff
GREGORY KAZDOBA

Electronically FILED by Superior Court of California, County of Los Angeles 8/13/2024 3:15 PM David W. Slayton, Executive Officer/Clerk of Court, By A. Salcedo, Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

GREGORY KAZDOBA, an individual,

Plaintiff,

v.

ZOLL MEDICAL CORPORATION, a Massachusetts corporation; and DOES 1 through 100, inclusive,

Defendants.

CASE NO.: 24VECV03878
*[Unlimited Jurisdiction]*

**PLAINTIFF GREGORY KAZDOBA'S COMPLAINT FOR DAMAGES FOR:**

1. **RETALIATION IN VIOLATION OF CALIFORNIA GOV'T CODE § 12940(H)**
2. **DISCRIMINATION IN VIOLATION OF CALIFORNIA GOV'T CODE § 12940(A)**
3. **HARASSMENT IN VIOLATION OF CALIFORNIA GOV'T CODE § 12940(J)**
4. **FAILURE TO PREVENT DISCRIMINATION, HARASSMENT AND RETALIATION IN VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**
5. **WRONGFUL FAILURE TO PROMOTE IN VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**
6. **RETALIATION IN VIOLATION OF LABOR CODE SECTION 1102.5**
7. **WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**
8. **RETALIATION IN VIOLATION OF CAL. LABOR CODE SECTION 98.6**
9. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
10. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

## DEMAND FOR JURY TRIAL

Plaintiff ("Plaintiff") alleges as follows on knowledge as to himself and his own acts/interactions, and on information and belief as to all other matters:

## PARTIES

1. Plaintiff, at all times relevant herein, is a resident of the State of California and County of Los Angeles.

2. Plaintiff is informed and believes that Defendant is, and was, a Massachusetts corporation, authorized to transact, and transacting, business in the State of California and County of Ventura. Plaintiff is informed and believes, and thereon alleges that, at all relevant times herein, Defendant had its headquarters and principal place of business at 269 Mill Road Chelmsford, MA 01824. Plaintiff is informed and believed, and thereon alleges that, at all times relevant herein, Defendant employed more than five (5) employees for each working day during each of twenty (20) or more calendar weeks in each relevant calendar year.

3. The true names and capacities of the Defendants named herein as Does 1 through 100, inclusive, whether individual, corporate, associate or otherwise, are unknown to Plaintiff who therefore sues such Defendants by fictitious names pursuant to California Code of Civil Procedure section 474. Plaintiff is informed and believes that all of the Doe Defendants are California residents. Plaintiff will amend this Complaint to show such true names and capacities when they have been determined.

4. Plaintiff is informed and believes that at all times relevant herein, each Defendant designated, including Does 1 through 100, was the agent, managing agent, principal, owner,

partner, joint venturer, representative, manager, servant, employee and/or co-conspirator of each of the other Defendants, and was at all times mentioned herein acting within the course and scope of said agency and employment, and that all acts or omissions alleged herein were duly committed with the ratification, knowledge, permission, encouragement, authorization and consent of each Defendant designated herein.

**JURISDICTION & VENUE**

5. This Court has personal jurisdiction over each of the Defendants because they are residents of and/or doing business in the State of California.

6. Under California Code of Civil Procedure section 395(a), venue is proper in this county because the adverse actions suffered by Plaintiff occurred in Los Angeles County.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

7. Plaintiff exhausted his administrative remedies by timely filing a complaint for the issues raised herein against the appropriate parties herein with the California Department of Fair Employment & Housing ("DFEH") and thereafter received a "Right to Sue" letter from the DFEH. Attached as **Exhibit A** is Plaintiff's Right to Sue Letter.

**FACTUAL ALLEGATIONS**

8. Zoll Medical Corporation is a recognized medical manufacturer producing software and medical devices for patients worldwide. Defendant is a leading medical device corporation that provides services in defibrillation, cardiac monitoring, ventilation, sleep apnea diagnosis, and a wide variety of medical care. Through the distribution and production of said products, Defendant is recognized for their services world-wide in diagnosing and treating patients affected by cardiopulmonary and respiratory conditions.

9. On or around 2009, Plaintiff, Gregory Kazdoba, received his Master of Business Administration ("MBA") from Cornell University. On or around March 27, 2012, Plaintiff was offered employment by Zoll Medical Corporation as a Hospital Territory Sales Manager. Plaintiff's essential functions included: achieving sales quotas, providing in-service education to customers, providing various reports required by management, expense and call activity reports on a weekly basis, implementing and maintaining company provided selling tools such as

defibrillator needs analysis, maintaining and tracking demo and evaluation inventory, developing an adequate pipeline of potential sales to meet territory sales expectations and maintaining short range and long term plans for developing sales within the assigned territory. Plaintiff's assigned territory to cover were hospitals located in Los Angeles County, Ventura County, Kern County, Santa Barbara County, and San Luis Obispo County. With respect to these territories, Plaintiff was tasked with scheduling in-person meetings with hospital executives to sell medical products and equipment from Zoll Medical Corporation. Plaintiff also worked hybrid from home located at 742 Nile River Drive, Oxnard, CA 93036. Plaintiff's work from home entailed finalizing reports, analysis for projects, work emails, and conducting team meetings with other Zoll Medical Employees. Plaintiff was compensated at a starting salary base of $60,000 annually plus commissions from projects he completed. See Commission Guidelines Attached as **Exhibit B.** Additionally, Plaintiff was compensated with a car & technology allowance of $925.00 per month. Plaintiff officially began his employment with Zoll Medical Corporation on May 14, 2012.

10. On or around May of 2012, Plaintiff was engaged to his now wife. On or around September 2012, Plaintiff and his wife married. Plaintiff and his wife had their first child in October of 2013, and proceeded to have a total of seven children by the termination of Plaintiff's employment at Zoll Medical Corporation, the last being born March 17, 2023.

11. On or around April 4, 2016, Plaintiff was rewarded with a promotion by his General Manager and Supervisor, Kent Sheffer. Plaintiff was given a salary and a change in job title from Territory Manager – Hospital to Senior Territory Manager. With the promotion, Plaintiff received an increase in pay, increasing his yearly salary of $62,129.60 to $64,600. Plaintiff also received an increase to his technology and car allowance to a total of $1,025.00 per month.

12. On or around May 14, 2016, Plaintiff received a Performance & Development Review ("PDR"). Mr. Sheffer was the one who conducted the review and, in his assessment, stated, "Being four years into the job, [Plaintiff]'s knowledge and skill level exceed what I would expect for someone with his tenure. He does quality work and holds himself to the highest

standards...At $7M in sales, he accounted for approximately 23% of the Region's $31M in sales in 2015 and was a major contributor to our success...His overall performance in 2015 far exceeds my expectations – do it again!" This performance review was submitted on May 20, 2016. As well as his outstanding performance review, Plaintiff finished as the #1 sales representative out of all the sales employees at Zoll. Mr. Sheffer stated in the review, "Greg had a remarkable year in 2015 finishing #1 out of 42 salespeople for the Hospital Division." Plaintiff was clearly exceeding the expectations of his superiors at Zoll and continued to bring this work ethic into all his projects and assignments.

13. On or around April 28, 2017, Plaintiff received another PDR. Mr. Sheffer conducted the review and, in his assessment, stated, "[Plaintiff] holds himself to a high standard and delivers quality work. He definitely takes initiative to develop useable tools and shares those with colleagues." Plaintiff's review shows that while Plaintiff was employed at Zoll Medical Corporation, Mr. Sheffer considered him to be a team player and an employee who wanted to help fellow coworkers get ahead and excel in the business. This performance review was submitted on May 31, 2017.

14. On or around May 9, 2018, Plaintiff was given another PDR. The review was conducted by Mr. Sheffer who stated in his assessment, "[Plaintiff] exceeds my expectations in all categories. His job knowledge is top notch, and he is passing that along to Mike Coco and others...His quality of work and skills at the job can be clearly assessed by his $9.5M performance." Mr. Sheffer was aware of Plaintiff's teamwork attitude and his drive to be the best and excel at his job. This performance review was submitted on May 15, 2018. Around the time of this review, Plaintiff was listed as #1 sales representative in the Hospital division for the second time in three years which was unprecedented in ZOLL's Hospital Division. Plaintiff continued to set records within his department and impress the Zoll executives.

15. On or around December 12-13, 2018, Plaintiff went in for an interview with Zoll Medical Corporation for the open position of Regional Manager but was forced to reschedule, due to his twin daughters' birth and subsequent stay in the Neonatal Intensive Care Unit ("NICU"). Prior to the meeting, Plaintiff had notified Vice President Javier Berendsohn that his

daughters' birth could happen at any moment.

16. On or around December 28, 2018, Plaintiff went in for his rescheduled interview with Zoll Medical Corporation and had reputable references including, Mr. Sheffer, who had worked with Zoll Medical Corporation for almost 30 years and had insisted that Plaintiff replace him for his position.

17. On or around January 2, 2019, Plaintiff received a call from Zoll Medical Corporation's Mr. Berendsohn with news regarding the outcome of the interview. In the phone call, Mr. Berendsohn discussed with Plaintiff the decision that had been made and stated, "Everyone liked you, you were the best prepared, and you're more than qualified, however, we can't promote you because you have too many kids; We're choosing someone with no kids at home." Plaintiff was left shocked by the comments made by Mr. Berendsohn. In response, Plaintiff made a complaint with Mr. Berendsohn and expressed his disappointment and utter disbelief that such a thing could even be brought into consideration when Plaintiff had done nothing but excel every year in his job and territory he was assigned. Plaintiff made it known in his complaint, that he did not agree with their reasoning for not promoting him. Plaintiff had always been private about his personal life and did not understand how they were aware of how many children he had, nor how it was an appropriate aspect in his consideration for the position he was applying for. Plaintiff was shocked by what had been said to him and did not want to be in a position to lose his job. Ultimately, the promotion was given to Mark Zoroya, now Regional Manager, who was known to have one grown child at the time.

18. On or around April 13, 2020, Plaintiff received a PDR. Mr. Zoroya was the new Regional Manager and was now the one conducting the review. In his assessment, he stated, "[Plaintiff] had another Great year finishing with $8,426,060- 103%! [Plaintiff] battled until the very end to exceed Quota. He demonstrated great tenacity in working with the Children's Hospital of Los Angeles – a huge competitive conversion for him and the last of the Top 10 Children's Hospitals that are now ZOLL!! [Plaintiff] is one of the leaders in the West and other TMs look to him…[Plaintiff] would make an excellent replacement for me after I retire. He has the skills to lead this team." Although Mr. Sheffer was no longer in the position, Plaintiff

continued to impress his supervisors and exceed expectations. This performance review was submitted on May 8, 2020.

19. On or around between June 3, 2020, and June 17, 2021, Plaintiff persistently provided sales reports to Mr. Berendsohn, indicating that the records revealed that Plaintiff hadn't received proper commission distribution for products he had sold. For the entirety of this period, Mr. Berendsohn postponed giving Plaintiff an explanation for why exactly his commission hadn't been properly distributed for the amount he was owed.

20. On or around June 2021, Plaintiff received a call from Mr. Berendsohn stating, "Yes, we know you weren't receiving the correct credit and commission; however, we're not going to do anything about it, and we'll try to resolve it moving forward." Plaintiff once more was left in a state of confusion and made a complaint with Mr. Berendsohn and told him that he did not agree with this course of action, and this was a lack of professionalism on Zoll Medical Corporation to treat employees in this manner. This incident left Plaintiff disheartened and disappointed with Zoll's improper conduct with employees, especially as Plaintiff had always worked to give the company 110% of his ability and loyalty. Plaintiff feared losing his job and did not want to "kick the hornet's nest".

21. On or around February 24, 2021, Plaintiff was assigned to give a presentation to the senior executives of Zoll Medical Corporation, on the topic of Commission Statements and to provide feedback on the matter to better improve the company policies. See Commissions Presentation attached as Exhibit B. In attendance during this meeting, was Mr. Kurt Sandstrom, Group Vice President of North American EMA, Mr. James Saltzman, Group Vice President of Public Safety, Mr. Jeff Roberts, Vice President of US EMS, Mr. Steven Flora, Senior Vice President of Zoll, Ms. Brenda Butler, Vice President of Military Sales, along with Mr. Berendsohn. In his presentation, Plaintiff outlined the inaccuracy and lack of information that employees were provided with regarding commissions. One of the executives in the room, Mr. Flora, who had been at Zoll Medical Corporation for more than 24 years, verbally acknowledged that discrepancies are often common when commissions are paid. Once the meeting was over, it was established that there was to be a second meeting and that a Vice President would be assigned

to the issue. Ultimately, Mr. Roberts was assigned to the task, and was to follow up and learn more about the problem. However, a second meeting never occurred, nor did Mr. Roberts, or any other executive, follow up on the matter.

22. On or around December 15, 2021, Plaintiff applied for a promotion and was interviewed for a second time by Mr. Berendsohn, who had conducted the interview for the Regional Manager position three years prior that Plaintiff had applied to. Mr. Zoroya was retiring from the position, and Mr. Sheffer suggested Plaintiff apply to the role. Plaintiff felt hesitant to do so after the interview he'd had a few years prior and was denied the position because of his marital status and religious beliefs. Still, Plaintiff went ahead and applied.

23. On or around January 14, 2022, Plaintiff received a call from Mr. Berendsohn regarding the outcome of the interview. Mr. Berendsohn explained that the reason for Plaintiff not being chosen for promotion is due to the amount of kids Plaintiff has, and that Plaintiff's religious beliefs on children are preventing Plaintiff from being promoted. Plaintiff felt outraged and told Mr. Berendsohn that Zoll Medical Corporation's reasoning for not promoting him was discriminatory on his personal life and that their decision was not based on his qualifications and longtime experience within the company as a trusted employee.

24. On or around April 1, 2022, Plaintiff attended a Zoom call with other members of the company. During the meeting Mr. Berendsohn announced that Plaintiff was receiving a change in territory and title. Plaintiff was overwhelmed and troubled to learn that he was being assigned a larger territory to cover and a new title. Plaintiff was caught off guard by the announcement, as he had not been given notice of the promotion nor the opportunity to think about if he wanted to accept this new role. Up until that moment, Plaintiff's position required him only to cover territory that stretched from Los Angeles to San Luis Obispo. Plaintiff's new title was Account Executive and this new proposed expansion of territory he was to now cover, was the length of ten states spread out over the US. Plaintiff was to now cover LA County, Northern California, Oregon, Washington, Alaska, Idaho, Montana, Wyoming, Colorado, Nevada, and Utah. Plaintiff felt it was a situation he had been forced into, seeing as he had not applied for the position, had not interviewed, and had not been made aware prior to the meeting

that this would be announced. The role also required a significant increase in travel and did not compensate him with a raise for taking on this new role and the added responsibility that came along with it.

25. On or around August 26, 2022, Plaintiff and other employees joined in a Microsoft Teams call to have a meet and greet with the new Vice President Ryan Grulke. Vice President Javier Berendsohn was moved to a new position as Senior Vice President and Mr. Grulke was taking over his responsibilities. At the end of the meeting, Mr. Grulke inquired if there were any other questions to be answered and discussed. Plaintiff once more took the opportunity to express how he believed that the commissions were not being paid accurately to employees and that he had brought this to the attention of Zoll Medical Leadership before but had made no progress in getting anyone to address and correct the issues he had presented. Plaintiff used his own experience from on or around August 2018 when he had gone through his financial records and found that $40,000 dollars in commission had not been paid to him for the completion of a project. At that time, Plaintiff made a complaint about this incident to the Commission Analyst who worked in the Commission Department and was paid the accurate amount that he was owed after further investigation and confirmation of his records. Had it not been for Plaintiff checking his own records, he would have never uncovered that he was still owed $40,000. After hearing his story, Mr. Grulke told Plaintiff he would follow up with him regarding the matter.

26. On or around August 29, 2022, Plaintiff received notice that Mr. Grulke wanted to schedule a meeting to speak with him. During this meeting, Mr. Grulke expressed how Plaintiff's consistent objections regarding the lack of communication and subsequent issues with commission pay, had earned him a reputation as a "complainer" amongst the senior executives. Plaintiff in response made a complaint with Mr. Grulke and expressed that, "it's difficult when employees are knowingly not paid correctly yet little is done about it." Plaintiff was firm and did not back down from his point. Plaintiff felt passionate regarding this topic and the lack of attention it had received over the years. Plaintiff felt he owed it to himself and fellow Zoll employees to speak up regarding the commission discrepancies he had witnessed during his employment with Zoll Medical Corporation. Afterwards, Mr. Grulke requested the presentation

Plaintiff had made a year earlier, which he had shared with the senior executives of the company as feedback to show the inaccuracies in commission payouts. Plaintiff felt that his reputation was being targeted at Zoll Medical Corporation for bringing up this issue and reminding executives consistently over time that what was being done was not right. Plaintiff put superior time and effort into projects he worked on, commonly spending years on completing these multi-million dollar projects.

27. On or around February 7, 2023, Plaintiff feeling frustrated with the lack of attention that his concerns were being given, sent a text message to his manager, David Dolan, stating, "What type of audit will be done before the end of the year to make sure the right TM/AM has received the correct capital and consumable credit this year? There are so many blatant errors… I have to believe there are many errors with commissions." Plaintiff shared his feelings regarding the situation because he felt he had genuine concerns regarding the inconsistencies with the commission payouts not just for himself but for other Zoll employees as well.

28. On or around April 1, 2023, Plaintiff was assigned to a new role, as Senior Account Executive by Mr. Grulke and Mr. Berendsohn. Once again, Plaintiff was not asked if this was a position he wanted to accept and was not informed of prior to the announcement. Plaintiff made a complaint with Mr. Berendsohn that this was not something that had been discussed prior with him and he did not agree with the sudden notice of the new position he was being given. Plaintiff did not want to cause any additional problems, seeing as his Senior Executives had verbally told him of their negative views of him regarding his familial life and his raising objections regarding commission discrepancies. Plaintiff tried to move on and act positive and not create further complications.

29. On or around May 11, 2023, Plaintiff was given a FY 2022 ZOLL Performance Review. This performance review was to analyze Plaintiff's work from April 1, 2022, through March 31, 2023. The review was conducted by Manager Mr. Dolin, who in his assessment, stated, "I agree with [Plaintiff]'s self-assessment and will add that [Plaintiff] has a strong foundation, is well rounded and brings a great deal of experience and success to himself and to his team. His start date with ZOLL was May 14, 2012. He has been recognized as a top performer and he has

been promoted to Senior Territory Manager and Regional Trainer." Plaintiff's performance review reflected Plaintiff's continued dedication and loyalty to Zoll Medical Corporation despite the setbacks he had faced with the company regarding accurate commission payouts, not having his complaints investigated, and the continued disparaging comments being made about his family. Plaintiff's review showed that Plaintiff's work standards were still exceeding above expectations within the company. Plaintiff's issues with commission and the constant negative comments made of his family, did not discourage Plaintiff's ability to continue his outstanding work within the company. Plaintiff did so well in fact that, Plaintiff was named as the #1 sales representative in the Hospital division for a third time. Plaintiff's good work was acknowledged at an awards ceremony in which he received trophies to commemorate his hard work.

30. On or around January 16, 2024, Plaintiff attended an in-person conference with other Zoll Medical employees at the Hyatt Regency located at 6225 W Century Blvd., Los Angeles, CA 90045 near the LAX Airport. During this meeting, Plaintiff spoke with the new Regional Manager Greg Pring, who approached and shared with Plaintiff that he'd heard a lot about him and how many kids he has. Plaintiff hesitant to continue the conversation, agreed and added that he has seven children. The Regional Manager proceeded to inquire and stated, "What religion are you, are you Mormon?" He then continued and added, "You're crazy, how can you possibly have time for work…I'll have to keep my eye on you." Plaintiff made a complaint to Mr. Pring and noted that this was not the first time he had been questioned by management over his personal life.

31. On or around between January 22, and January 26, 2024, Plaintiff requested to take the week off because he had a lot of vacation time that he had accrued during his employment at Zoll Medical Corporation. When Plaintiff chose to take time off during this week, Plaintiff let Mr. Pring know, that although he would be taking a week of vacation time, he would still be answering calls, reviewing quotes, and sending emails from home. Plaintiff made sure to always make himself available to clients, even when he was choosing to take vacation time.

32. On or around January 29, 2024, Plaintiff had a scheduled phone call with Mr. Pring. Mr. Pring brought up to Plaintiff that going forward, management wanted to start

implementing the expectation for Zoll employees to log 110 calls by the end of each quarter. Mr. Pring also added that Mr. Grulke and Mr. Berendsohn were overseeing the number of visits they expected their regional managers to complete with hospitals. Mr. Pring used this example to state that he was not concerned as to how many times an employee visited a hospital, as long as when you were on the premises of a hospital to log those events as a call so that each employee is able to complete the expected 110 calls for the quarter. Additionally, during the meeting, Mr. Pring proceeded to discuss with Plaintiff his alleged concern regarding Plaintiff's book of business, territories, and his use of vacation time during the month of January that was seen as a "concern."

33. Plaintiff in response made a complaint with Mr. Pring and proceeded to share his data, quotes, and reports from his online work dashboard to show proof that his work was on par for what the company expected. Mr. Pring had just started with ZOLL a few weeks earlier at the beginning of January. It was peculiar that Mr. Pring was already questioning the Plaintiff over his work ethic, with no explanation as to why his work was being doubted other than his unrelated comment concerning Plaintiff's marital and parental status. Plaintiff also felt that Mr. Pring had not been at the company long enough to be able to understand the inner workings of how the company operated. Mr. Pring had not even finished with his training at Zoll Medical Corporation; at a minimum, it takes new representatives and managers around 12-18 months to fully understand the company's operations.

34. On or around February 21, 2024, Plaintiff was expecting to close a major project in March 2024, that he had been working on during the last two years. Plaintiff had been closely working with Santa Clara County Hospitals, specifically with Santa Clara Valley Medical Center located at 751 S Bascom Avenue, San Jose, CA 95128, the O'Connor Hospital located at 2105 Forest Avenue, San Jose, CA 95128, and the St. Louise Regional Hospital located at 9400 No Name Uno, Gilroy, CA 95020. Plaintiff expected to earn around $350,000 dollars in commission for his work related to the projects. Plaintiff had a call scheduled with Santa Clara Valley Medical Center's main hospital administrator as the last step to close the deal. The hospital's leadership team confirmed they would be placing an order for approximately $4.8 million dollars. Mr. Pring, Mr. Grulke, and a Senior Account Manager Tom Sutton for Zoll Medical Corporation were all

present for the Teams call.

35. On or around February 21, 2024, Plaintiff noticed that the quarterly sales report, for the quarter which started on January 1st, 2024, appeared inaccurate. Plaintiff asked Representative Doug Peterson if he had different sales reports showing the correct information.

36. Later that afternoon, Plaintiff decided to review the order credit for the quarter and realized once more that there were inaccuracies with the numbers reported. Plaintiff shared that he had not received full credit and believed that the projects were not being coded properly. When an employee is assigned to a project, their name is attached to it, therefore they can receive the proper credit. If they leave the project, their name should still be attached and not removed so they can get proper credit for their work.

37. On or around the next morning of February 22, 2024, Plaintiff received notification for an invite for a Teams meeting with Mr. Pring for the following day.

38. On February 23, 2024, while Plaintiff was driving to a scheduled meeting with a hospital in Santa Monica, CA, he called in to join the planned Teams meeting which was sent the previous day. However, due to driving through the canyons to reach Pacific Coast Highway, Plaintiff's call dropped, and he was unable to rejoin the Teams meeting. Plaintiff waited until he was closer to PCH to regain reception and call back. During this drive, Mr. Pring issued Plaintiff a termination notice via email. Mr. Pring did not consult or speak with Plaintiff after the call dropped, leaving Plaintiff shocked to discover the email once he regained reception. Plaintiff was not given the courtesy of being informed over the phone first and did not have the opportunity to address any of the assertions made in the termination email. Plaintiff was not given notice and was unaware that his termination was the topic of the call. Upon arriving at his destination, Plaintiff reviewed the termination email in its entirety and found that the termination was due to false accusations regarding an alleged incorrect call log when he visited Stanford Children's Hospital two weeks prior, on February 7, 2024.

39. To illustrate how call logging works, Zoll Medical Corporation uses Salesforce to log daily activity when visiting any hospital site. Categories available for logging on-site activities include: Prospecting, Selling, Financial Discovery, Establishing Value, Vendor of Choice,

Closing the Sale, Technical, Meeting, and In Service. When cold calling a facility without an appointment, a hospital representative might use a hospital phone in a common area like the lobby or cafeteria to reach hospital personnel. Often, they might not reach their target or find them out of the office, in which case they may leave a voicemail or handwritten note. In such scenarios, even without contact, the cold call is still logged in Salesforce. If a scheduled meeting with hospital personnel is canceled at the last minute, employees still log the call in Salesforce. Regional Managers directed employees to log these activities, despite the absence of a specific category for canceled meetings. These scenarios, happening semi-regularly, lack a dedicated option for logging a cancelled meeting or in service in Salesforce. Still, despite this common practice that was never an issue prior, Plaintiff was terminated without any notice.

40. The email stated that on February 7, 2024, Salesforce reflected that Plaintiff incorrectly logged a call, which was considered "fraud" and led to automatic termination. Curiously, Mr. Pring waited 16 days to address this matter. To clarify, Plaintiff never had the opportunity to respond to any of the false accusations in Mr. Pring's termination email. Not once did Mr. Pring contact Plaintiff within that 16-day window to ask about anything related to his visit to Stanford Children's on February 7. In fact, Plaintiff was back on site at Stanford Children's on February 22, just before receiving his meeting invite for termination.

41. In his termination letter, Mr. Pring slandered Plaintiff by claiming that his actions constituted "fraud" when the policy of logging such a call is companywide. Moreover, Mr. Pring had zero experience performing Plaintiff's job responsibilities and had never logged a call in Salesforce with Zoll or as a Zoll Hospital representative. In his twelve years at Zoll Medical Corporation, Plaintiff never had issues logging calls.

42. Plaintiff's termination was a pretext to avoid addressing his persistent concerns regarding accurate commission pay and in part due to discrimination based on protected categories. Plaintiff repeatedly raised issues about inaccuracies in commission payouts and faced discrimination based on his marital status and religious beliefs. These concerns, along with the closure of an imminent major deal, were what motivated Zoll Medical Corporation to fabricate a pretextual and ludicrous reason to terminate an employee, with a twelve-year documented record

of sterling employment and superior performance.

43. At the time of his termination, Plaintiff was actively working on several significant projects that were near final purchase, which he was not given the opportunity to complete given Plaintiff's termination and thus did not receive the anticipated commissions. In addition to the imminent deal with the Santa Clara County hospitals, these included a project with Stanford Children's Hospital, where he expected to earn around $120,000 in commission; a deal with Community Memorial Hospital in Ventura County, estimated to bring in $100,000; and a project with Bakersfield Mercy Hospital, which was projected to earn him approximately $50,000.

44. In sum, Plaintiff's termination not only deprived him of addressing his legitimate workplace concerns but also cost him substantial commissions from ongoing projects, reflecting the unjust and discriminatory nature of the Zoll Medical Corporation's actions.

## FIRST CAUSE OF ACTION

## RETALIATION IN VIOLATION OF CALIFORNIA GOV'T CODE § 12940(h)

## (AGAINST ENTITY DEFENDANT)

45. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

46. Pursuant to Government Code section 12940(h), it is an unlawful employment practice for an employer or person to retaliate against any person because the person has opposed any practices forbidden under California's Fair Employment and Housing Act ("FEHA") or because the person has filed a complaint, testified, or assisted in any proceeding under this part.

47. Plaintiff was discharged from his employment at Defendant because he made complaints about his missing commission and Defendant's discriminatory remarks regarding Plaintiff's marital status and religious beliefs. By making such reports and complaints about his discrimination and bias on account of Plaintiff's marital status and religious beliefs, Plaintiff engaged in a legally protected activity and held a reasonable belief that Defendant was engaging in acts that violated FEHA. [Gov. Code § 12940(h); Cal. Code Regs. Tit. 2, § 11021].

48. Plaintiff is informed and believes that he was terminated in retaliation for making complaints regarding Defendant's discriminatory actions and unpaid commission wages and bias

against Plaintiff on the basis of his marital status and religious beliefs and opposing employment practices that he reasonably believed to exist and to violate FEHA. Accordingly, Defendant, and each of them, terminated Plaintiff's employment in retaliation for Plaintiff exercising his rights under FEHA.

49. As a proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as described above, Plaintiff has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

50. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has suffered and will continue to suffer physical, emotional and mental injuries to Plaintiff's damage in an amount to be ascertained at the time of trial.

51. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has and will necessarily expend sums for the treatment of the physical, emotional and mental injuries sustained by Plaintiff as a result of said Defendant's acts in an amount to be ascertained at the time of trial.

52. The above-described acts of Defendant(s) and DOES 1 through 100, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said Defendant and to deter others from engaging in similar conduct.

## SECOND CAUSE OF ACTION

## DISCRIMINATION IN VIOLATION OF CALIFORNIA GOV'T CODE § 12940(a)

## (AGAINST ENTITY DEFENDANT)

53. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

54. Pursuant to the Fair Employment and Housing Act ("FEHA"), it is an unlawful employment practice for an employer, because of an employee's age, to discharge the person from employment or to discriminate against the person in compensation or in terms, conditions,

or privileges of employment. Plaintiff was discriminated against in the terms and conditions of his employment when he was denied a promotion, accused of fraudulent conduct, and terminated by Defendant because of his marital status and religious beliefs. By taking these adverse employment actions against Plaintiff due to his marital status and religious beliefs, Defendant violated the FEHA and the corresponding regulations.

55. As a proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as described above, Plaintiff has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

56. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has suffered and will continue to suffer physical, emotional and mental injuries to Plaintiff's in an amount to be ascertained at the time of trial.

57. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has and will necessarily expend sums for the treatment of the physical, emotional and mental injuries sustained by Plaintiff as a result of said Defendant's acts in an amount to be ascertained at the time of trial.

58. The above-described acts of Defendant(s) and DOES 1 through 100, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said Defendant and to deter others from engaging in similar conduct.

## THIRD CAUSE OF ACTION

## HARASSMENT IN VIOLATION OF CALIFORNIA GOV'T CODE § 12940(j)

## (AGAINST ENTITY DEFENDANT)

59. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

60. Government Code section 12940(j) provides that it is an unlawful employment practice "[f]or an employer…because of race, religious creed, color, national origin, ancestry,

physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status, to harass an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract." California regulations define harassment as verbal harassment, such as epithets, derogatory comments or slurs (or repeated romantic oversures, sexual comments and jokes or prying into one's personal affairs), physical harassment, such as unwanted touching, rubbing against someone, assault and physical interference with movement or work, or visual harassment, such as derogatory cartoons, drawings, or posters. *See* Cal. Code Regs., Tit. 2, § 11019(b)(1).

61. Defendant subjected Plaintiff to harassing conduct, including derogatory comments Plaintiff to adversely affect his work environment in a severe or pervasive way on the basis of his marital status and religious beliefs. In doing so, Defendant created a work environment that was hostile, intimidating, offensive, oppressive, and/or abusive.

62. As a proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as described above, Plaintiff has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

63. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has suffered and will continue to suffer physical, emotional and mental injuries to Plaintiff's damage in an amount to be ascertained at the time of trial.

64. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has and will necessarily expend sums for the treatment of the physical, emotional and mental injuries sustained by Plaintiff as a result of said Defendant's acts in an amount to be ascertained at the time of trial.

65. The above-described acts of Defendant(s) and DOES 1 through 100, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient

to punish said Defendant and to deter others from engaging in similar conduct.

**FOURTH CAUSE OF ACTION**

**FAILURE TO PREVENT DISCRIMINATION, HARASSMENT AND RETALIATION IN VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**

**(AGAINST ENTITY DEFENDANT)**

66. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

67. Government Code section 12940(k) provides that it is an unlawful employment practice "[f]or an employer...to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring. An employer can also be liable for failure to take all reasonable steps necessary to prevent retaliation." *CACI 2527.* Such steps include training, adopting an anti-harassment, anti-discrimination, and anti-retaliation policy, and implementing and enforcing those policies.

68. As detailed above, Defendant subjected Plaintiff to unlawful harassment, discrimination, and retaliation in the course of his employment. Defendant failed to take all reasonable steps to prevent and remedy the unlawful harassment, discrimination, and retaliation from occurring. Defendant failed to take all reasonable steps to prevent and remedy the unlawful harassing, discrimination, and retaliation from occurring.

69. Defendant's failure to take all reasonable steps to prevent the unlawful harassment, discrimination, and retaliation harmed Plaintiff and was a substantial factor in causing Plaintiff's harm.

70. In engaging in the aforementioned conduct, Defendant, and each of them, aided, abetted, incited, compelled, and/or coerced unlawful employment practices in violation of the FEHA and the announced policy of this State against such practices.

71. As a proximate result of the acts of Defendant and DOES 1 through 100, and each of them, as described above, Plaintiff has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

72. As a further proximate result of the acts of Defendant and DOES 1 through 100, and each of them, as alleged above, Plaintiff has suffered and will continue to suffer physical, emotional and mental injuries to Plaintiff's damage in an amount to be ascertained at the time of trial.

73. As a further proximate result of the acts of Defendant and DOES 1 through 100, and each of them, as alleged above, Plaintiff has and will necessarily expend sums for the treatment of the physical, emotional and mental injuries sustained by Plaintiff as a result of said Defendant's acts in an amount to be ascertained at the time of trial.

74. The above-described acts of Defendant and DOES 1 through 100, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said Defendant and to deter others from engaging in similar conduct.

## FIFTH CAUSE OF ACTION

## WRONGFUL FAILURE TO PROMOTE IN VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT

## (AGAINST ENTITY DEFENDANT)

75. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

76. California Labor Code section 12940(a) mandates that it is unlawful for "an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, reproductive health decision making, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or veteran or military status of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."

77. Plaintiff has a well-documented history of positive feedback regarding his roles and responsibilities at Defendant. However, Defendant nevertheless repeatedly denied Plaintiff

a promotion. Defendant denied Plaintiff a promotion and took the other adverse actions against Plaintiff alleged herein, at least in substantial part, due to Defendant's marital status and religious beliefs, which Plaintiff reasonably believed as a violation of state and federal law and regulations.

78. As a proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as described above, Plaintiff has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

79. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has suffered and will continue to suffer physical, emotional and mental injuries to Plaintiff's damage in an amount to be ascertained at the time of trial.

80. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has and will necessarily expend sums for the treatment of the physical, emotional and mental injuries sustained by Plaintiff as a result of said Defendants' acts in an amount to be ascertained at the time of trial.

81. The above-described acts of Defendant(s) and DOES 1 through 100, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said Defendants and to deter others from engaging in similar conduct.

## SIXTH CAUSE OF ACTION

## RETALIATION IN VIOLATION OF LABOR CODE SECTION 1102.5

## (AGAINST ENTITY DEFENDANT)

82. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

83. California Labor Code section 1102.5(b) mandates: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or

regulation."

84. Defendant terminated Plaintiff's employment and took the other adverse actions against Plaintiff alleged herein, at least in substantial part, in retaliation for Plaintiff making complaints that he was subjected to discrimination due to his marital status and religious beliefs, which Plaintiff reasonably believed as a violation of state and federal law and regulations.

85. As a proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as described above, Plaintiff has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

86. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has suffered and will continue to suffer physical, emotional and mental injuries to Plaintiff's damage in an amount to be ascertained at the time of trial.

87. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has and will necessarily expend sums for the treatment of the physical, emotional and mental injuries sustained by Plaintiff as a result of said Defendant's acts in an amount to be ascertained at the time of trial.

88. The above-described acts of Defendant(s) and DOES 1 through 100, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said Defendant and to deter others from engaging in similar conduct.

**SEVENTH CAUSE OF ACTION**

**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

**(AGAINST ENTITY DEFENDANT)**

89. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

90. Defendant's act of terminating Plaintiff's employment due to his marital status and religious beliefs and making complaints of his missing commission, and engaging in

protected activities as described above, was against the public policy of the State of California as evidenced by the enactment of FEHA and Labor Code section 1102.5.

91. The above-described conduct by Defendant, and each of them, was against the public policy of the State of California.

92. In engaging in the aforementioned conduct, Defendant, and each of them, aided, abetted, incited, compelled, and/or coerced unlawful employment practices in violation of the FEHA and the announced policy of this State against such practices.

93. As a proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as described above, Plaintiff has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

94. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has suffered and will continue to suffer physical, emotional and mental injuries to Plaintiff's damage in an amount to be ascertained at the time of trial.

95. As a further proximate result of the acts of Defendant(s) and DOES 1 through 100, and each of them, as alleged above, Plaintiff has and will necessarily expend sums for the treatment of the physical, emotional and mental injuries sustained by Plaintiff as a result of said Defendant's acts in an amount to be ascertained at the time of trial.

96. The above-described acts of Defendant(s) and DOES 1 through 100, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said Defendant and to deter others from engaging in similar conduct.

## EIGHTH CAUSE OF ACTION

## RETALIATION IN VIOLATION OF CAL. LABOR CODE SECTION 98.6

## (AGAINST ENTITY DEFENDANT)

97. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

98. California Labor Code section 98.6(a) states "A person shall not discharge an employee or in any manner discriminate, retaliate, or take any adverse action against an employee...because the employee...made a written or oral complaint that he or she is owed unpaid wages...or because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her."

99. Plaintiff repeatedly complained to Defendant that he had not been paid all wages owed to him as commission. Shortly after, and as a result therefrom, Defendant discharged Plaintiff and ended his employment using manufactured and false pretext.

100. As a proximate result of the acts of Defendant and DOES 1 through 100, and each of them, as described above, Plaintiff has suffered and will continue to suffer economic damages, including lost wages and benefits, and other compensatory damages in an amount to be ascertained at the time of trial.

101. As a further proximate result of the acts of Defendant and DOES 1 through 100, and each of them, as alleged above, Plaintiff has suffered and will continue to suffer physical, emotional and mental injuries to Plaintiff's damage in an amount to be ascertained at the time of trial.

102. As a further proximate result of the acts of Defendant and DOES 1 through 100, and each of them, as alleged above, Plaintiff has and will necessarily expend sums for the treatment of the physical, emotional and mental injuries sustained by Plaintiff as a result of said defendant's acts in an amount to be ascertained at the time of trial.

103. The above-described acts of Defendant and DOES 1 through 100, and each of them, were willful, intentional and malicious and done with the intent to vex, injure and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish said defendant and to deter others from engaging in similar conduct.

104. To the extent permitted by law, Plaintiff will seek attorneys' fees for the above-referenced claims against Defendant.

## NINTH CAUSE OF ACTION

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(AGAINST ENTITY DEFENDANT)**

105. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

106. The actions of Defendant as alleged herein were intentional and were intended to or were done to cause Plaintiff emotional distress or were done with reckless disregard as to whether Plaintiff would be caused emotional distress.

107. The actions of retaliating against Plaintiff for opposing Defendant's discrimination toward his marital status and religious beliefs and making a complaint regarding Defendant's withholding of his earned commission wages, was per se extreme and outrageous. The actions of Defendant, as alleged herein, including failure to promote and withholding of commission wages, were not related to Defendant's management activities, but instead were performed with the intent to discriminate, retaliate, and harass.

108. As an actual or proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer extreme and severe anguish, humiliation, embarrassment, emotional distress, mental suffering, nervousness, tension, anxiety, and depression, in an amount to be proven at trial in excess of the jurisdictional minimum of this court.

109. Plaintiff also seeks an award of attorneys' fees and costs to counsel where permitted by applicable law, including under California Code of Civil Procedure section 1021.5 because: (a) this action confers a significant benefit to the general public or a large class of persons impacted by the practices alleged herein; (b) the necessity and financial burden of private enforcement makes the award appropriate; and (c) such fees should not in the interest of justice be paid out of the recovery to Plaintiff.

**<u>TENTH CAUSE OF ACTION</u>**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**(AGAINST ENTITY DEFENDANT)**

110. Plaintiff incorporates by reference all preceding and subsequent paragraphs.

111. Plaintiff alleges that at least some of the acts described previously in his complaint

were done negligently and that such conduct was done in reckless disregard of the probability of said conduct causing him severe emotional distress. By engaging in the course of conduct described above, Defendant breached their duty of care which they owe to Plaintiff and all others.

112. As an actual or proximate result of Defendant's actions, Plaintiff has suffered and continues to suffer extreme and severe anguish, humiliation, embarrassment, emotional distress, mental suffering, nervousness, tension, anxiety, and depression, in an amount to be proven at trial in excess of the jurisdictional minimum of this court.

113. Plaintiff also seeks an award of attorneys' fees and costs to counsel where permitted by applicable law, including under California Code of Civil Procedure section 1021.5 because: (a) this action confers a significant benefit to the general public or a large class of persons impacted by the practices alleged herein; (b) the necessity and financial burden of private enforcement makes the award appropriate; and (c) such fees should not in the interest of justice be paid out of the recovery to Plaintiff.

## JURY TRIAL DEMANDED

1. Plaintiff demands a jury as to all causes of action.

## PRAYER FOR RELIEF

2. Plaintiff prays judgment against Defendant as follows:

a. For general economic and non-economic damages according to proof;

b. For special damages according to proof;

c. For punitive damages where allowed by law;

d. For injunctive relief according to proof enjoining the unlawful, fraudulent and/or unfair practices, policies and patterns alleged herein;

e. For prejudgment interest pursuant to California Civil Code section 3287 and/or California Civil Code section 3288 and/or any other provision of law providing for prejudgment interest;

f. For attorneys' fees where allowed by law;

g. For costs of suit incurred herein;

h. For such other and further relief as this Court deems just and proper.

DATE: July 18, 2024

BLUESTONE LAW

By: ______________________________
HARRISON WHEELER
Attorney for Plaintiff GREGORY KAZDOBA

# EXHIBIT A

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency
GAVIN NEWSOM, GOVERNOR
KEVIN KISH, DIRECTOR

Civil Rights Department
651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 8, 2024

RE: **Notice of Filing of Discrimination Complaint**
CRD Matter Number: 202408-25741508
Right to Sue: Kazdoba / Zoll Medical Corporation

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the Civil Rights Department (CRD) in accordance with Government Code section 12960. This constitutes service of the complaint pursuant to Government Code section 12962. The complainant has requested an authorization to file a lawsuit. A copy of the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact information.

No response to CRD is requested or required.

Sincerely,

Civil Rights Department

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency GAVIN NEWSOM, GOVERNOR

Civil Rights Department KEVIN KISH, DIRECTOR

651 Bannon Street, Suite 200 | Sacramento | CA | 95811
1-800-884-1684 (voice) | 1-800-700-2320 (TTY) | California's Relay Service at 711
calcivilrights.ca.gov | contact.center@calcivilrights.ca.gov

August 8, 2024

Gregory Kazdoba
,

RE: **Notice of Case Closure and Right to Sue**
CRD Matter Number: 202408-25741508
Right to Sue: Kazdoba / Zoll Medical Corporation

Dear Gregory Kazdoba:

This letter informs you that the above-referenced complaint filed with the Civil Rights Department (CRD) has been closed effective August 8, 2024 because an immediate Right to Sue notice was requested.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this CRD Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Civil Rights Department

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**
**Civil Rights Department**
**Under the California Fair Employment and Housing Act**
**(Gov. Code, § 12900 et seq.)**

**In the Matter of the Complaint of**
Gregory Kazdoba CRD No. 202408-25741508

Complainant,

vs.

Zoll Medical Corporation
,

Respondents

---

**1.** Respondent **Zoll Medical Corporation** is an **employer** subject to suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

**2**. Complainant **Gregory Kazdoba**, resides in the City of **,** State of **.**

**3**. Complainant alleges that on or about **February 23, 2024**, respondent took the following adverse actions:

**Complainant was harassed** because of complainant's religious creed - includes dress and grooming practices, marital status.

**Complainant was discriminated against** because of complainant's religious creed - includes dress and grooming practices, marital status and as a result of the discrimination was terminated, denied hire or promotion, denied any employment benefit or privilege, denied accommodation for religious beliefs, denied work opportunities or assignments.

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment, requested or used a religious accommodation and as a result was terminated, denied hire or promotion, denied any employment benefit or privilege, denied accommodation for religious beliefs.

**Additional Complaint Details:**

VERIFICATION

I, **Harrison Wheeler**, am the **Attorney** in the above-entitled complaint. I have read the foregoing complaint and know the contents thereof. The matters alleged are based on information and belief, which I believe to be true.

On August 8, 2024, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**Canoga Park, CA**

# EXHIBIT B

# ZOLL MEDICAL CORPORATION

## COMMISSION AND BONUS GUIDELINES FOR U.S. SALES EMPLOYEES

Effective April 1, 2020

Commissions and bonuses will be paid in accordance with the Commission and Bonus Guidelines. ZOLL reserves the right to amend the Commission and Bonus Guidelines at its discretion. ZOLL will provide 30 days' notice prior to implementing any changes to the Commission and Bonus Guidelines.

**Effective Date:** The Commission and Bonus Guidelines are effective April 1, 2020 and will automatically renew. The Commission and Bonus Guidelines apply only to Commissionable Transactions (defined below) while the Commission and Bonus Guidelines are in effect.

**Acceptance: Signing this Agreement is a condition of every Field Personnel's continued employment. If a Field Personnel does not sign this Agreement but the person continues to work for ZOLL for at least 30 days after receiving this Agreement, the Field Personnel and ZOLL will have mutually agreed that this Agreement will be binding on the Field Personnel and ZOLL.**

**Eligibility:** The Commission and Bonus Guidelines are applicable to ZOLL Field Personnel (defined below).

## REVENUE RECOGNITION POLICY

Revenue recognition compliance is critical to the continued existence of the company. The following revenue recognition policy is the guidance to which all ZOLL Field Personnel must adhere during the process of selling ZOLL's products.

There are four major conditions, which must be met before ZOLL can recognize revenue from any sale. These include: (1) persuasive evidence of an arrangement, (2) the arrangement is fixed and determinable, (3) delivery has occurred, and (4) collectability is reasonably assured. These conditions will be defined below along with other concepts, which need to be adhered to.

(1) **Persuasive evidence of an arrangement**: ZOLL requires a firm purchase order or signed order on customer letterhead, with no material or unusual contingencies, authorized by and provided by an authorized representative of the customer. Purchase orders are legal documents and once accepted are binding contracts. Purchase orders from customers should include details on the following items:

- Billing address
- Shipping address
- Payment terms
- Shipping terms
- Approved by person of authority
- Tax status
- Itemized with product details and total dollars
- Trade-ins, if applicable

(2) **The arrangement is fixed and determinable**: The fixed and determinable criteria is fulfilled when a price has been established between ZOLL and the end customer and ZOLL has no additional obligations to the customer once the products have been delivered and/or ZOLL has completed the in-service. The initial part of this is the quoting process. The North American Sales teams are required to submit all requests for quotes to the Sales Support department for processing. There are two reasons for this: (1) ZOLL wants to ensure consistency in the quotes that are delivered to customers and (2) to ensure that quotes have been reviewed and authorized by the appropriate personnel (i.e. Sales Director, Director of Sales Operations and/or a Group Vice President). To ensure the proper accounting of all orders, all components of an order must be included in the quotation provided to the customer. This includes all products (sold and given away), shipping terms, and payment terms.

Giveaways - Any product that you wish to give to the customer as part of a deal needs to be included in the quotation to that customer. Costs for product that is promised or given away are required to be accounted for inthe period that the sale takes place. If this information is absent from the quotation or customer purchase order, ZOLL has no obligation to provide any products to customers, which are not listed on the quotation or purchase order.

(3) **Delivery has occurred**: ZOLL's preferred shipping terms are FOB Shipping Point (or "Chelmsford"). FOB Shipping Point means that title transfers and insurable risk passes to the end-customer at ZOLL's shipping dock upon delivery to the carrier. "FOB Shipping Point" should be used for all shipping terms.

Delivery must be at a customer site or a site designated and owned by the customer. A ZOLL employee cannot store (at ZOLL's expense) or hold equipment on behalf of a customer. If a ZOLL employee stores or holds equipment; this would not be considered a sale for revenue recognition purposes.

FOB Destination is permissible, though not preferred. FOB Destination means that the customer takes title to the product when it arrives at their receiving point. Revenue cannot be recorded until the customer has received the product at their location. When orders have FOB Destination, ZOLL runs the risk of not counting the revenue associated with the order because the order was received too late in the quarter or due to manufacturing issues which prevent shipping until late in the quarter. Additionally, ZOLL may incur excessive freight costs because orders have to be shipped expeditiously to arrive at the customer site before the quarter ends.

All shipping terms other than FOB Shipping Point need to be approved by the Director of Sales Operations, a Group Vice President or a designate of a Group Vice President.

(4) **Collectability is reasonably assured:** Collectability is determined by the Credit Department after successfully completing a formal credit review. This review may involve a completed customer profile or credit application, credit and bank references, obtaining a third party credit rating, and discussions with the customer. In relation to new ZOLL customers, it is critical to the credit review process, that the sales rep or customer provides the Credit Department with a completed customer profile in order to expedite the process. A credit limit will be determined based upon all of the information available.

Another component, which factors in the collectability of an order, is the payment terms. Standard payment terms for ZOLL are Net 30 days, which means that the customer has 30 days from the invoice date to pay their invoice before being considered delinquent ("NET 30").

Customer terms longer than30 days begin to affect our DSO's (Days Sales Outstanding). DSO's are the average number of days that our receivables are outstanding from our customers.

All extended payment terms must be approved by the Director of Sales Operations, a Group Vice President or a designate of a Group Vice President.

**Conditional Payment Terms and Contingencies:** Any time that a customer's payment to us is dependent or contingent on other events or obligations, ZOLL is not allowed to recognize the revenue from that sale until all of those events occur or obligations are completed. Title or ownership has not transferred to the customer until ZOLL has completed its obligation under the terms of the sale. Examples include: shipping terms which are FOB Destination or anything other than FOB Shipping Point and customer acceptance/inspection of equipment.

**Rights of Return:** A Right of Return is a representation to the customer that they may return their equipment at any time and receive either a credit/refund or get relief on their remaining obligation to pay ZOLL. There is a big difference between telling a customer that we will take back the product if they are not happy versus telling them we stand behind our product and will do everything to make them happy with our equipment. As representatives of ZOLL, you **cannot** indicate verbally or in writing that we will take back a product if they are unhappy with it prior to them placing an order to ZOLL.

If a customer wishes to evaluate our product for a period of time, we can send them an evaluation unit. The customer can return the product when the predetermined evaluation period is complete and there would be no revenue recorded in this form of transaction. In the case of a customer wishing to keep/purchase the product, a fully authorized and executed purchase order or a similar contractual document is necessary.

**Leasing Arrangements:**

All leasing arrangements must be communicated to and reviewed by the Director of Sales Operations, a Group Vice President or a designate of a Group Vice President. Most leases contain a customer acceptance clause, which means that the leasing company will not pay until the customer has physically received, inspected, and accepted the equipment and thus will preclude ZOLL from recognizing the revenue until we receive the payment.

Again revenue recognition is currently and will continue to be one of the most important topics closely reviewed by our internal staff along with our external accounting firm and our parent company. Our external firm will typically select recent revenue transactions and contact our customers requesting confirmation of the amounts owed to ZOLL and confirm any terms given to the customer.

## COMMISSION/BONUS GUIDELINES

There are three types of sales: (1) capital equipment , (2) capital equipment leases/rentals , and (3) software sales.

**Capital Equipment Sales:** A "Commissionable Transaction" exists for a capital equipment sale once an order has been accepted and booked, shipped by ZOLL and the customer has received the equipment and completed any in-service.

**Capital Equipment Leases/Rentals:** A "Commissionable Transaction" exists for the committed time period in a capital equipment lease/rental once an order for the lease/rental has been accepted and booked, ZOLL receives the signed lease/rental agreement and ZOLL has invoiced the customer for one month of the term of the agreement. For the duration of the lease/rental agreement, a Commissionable Transaction will occur for each month the customer is invoiced under the terms of the agreement. For example, if a customer cancels the lease/rental agreement after six months, there will be no Commissionable Transactions following the cancellation of the agreement. For a capital equipment lease agreement, if the customer decides to purchase the capital equipment at the end of the lease, that purchase will be considered a Capital Equipment Sales Commissionable Transaction and will be governed by the terms applicable to commissions for Capital Equipment Sales.

**Software Sales:** A "Commissionable Transaction" exists for the first year of the sale of any software agreement once an order has been booked and accepted, ZOLL receives the signed software agreement from the customer, and ZOLL has invoiced the customer. For the duration of the software agreement, on each anniversary of the booking of the order, if the customer remains committed to the software agreement, it will be deemed a "Commissionable Transaction" for that year. For example, if a customer cancels a software agreement after year one, commissions earned for the software agreement will be limited to the first year of the agreement.

It is ZOLL's expectation that after an order is accepted and booked, Field Personnel are maintaining ZOLL's relationship with the customer to move the sale to completion or to ensure the customer commits to the entire time commitment provided in the lease/rental/software sales agreement.

Order Acceptance
In order for Field Personnel to receive order dollar credit on an order to be eligible for a commission or commission advance, the order must be received, accepted and booked following the criteria below:

- Completion of Credit Approval and Assignment of New Customer Number
  New Customer refers to Credit Policy and Procedures.
  Existing Customer with credit issues is subject to reversal, if issues are not resolved within 60 days.
  Orders will be reversed, held and re-accepted upon resolution.
- Order Requirements:
  Shippable within 6 months.
  Accepted payment terms -Terms other than NET 30 must be approved by BOTH Sales Management and Credit
  Within the Field Personnel's assigned Territory
  For products available on the current price list only

Approved pricing
Itemized by line with part number, description and price
Trade-in's must be itemized with part number, description, serial number, and Trade-in amount

- Purchase Order Documentation Requirements: Fax, letter, and e-mails are all acceptable for order acceptance.
- Without contingencies
- Authorized Individual(s) Signature(s)

  **Hospitals, Municipalities and Other Businesses-** A hard copy of purchase order(s) with authorized individual signature(s).

  **Volunteer Fire departments/Squad and Other Entities-** which do not have a purchase order system. Signed purchase order letters by an authorized individual(s), confirmation on entity's stationary AND verbal confirmation by a Customer Service Coordinator are required to process the order.

- If your Incentive Plan requires you to meet a quota to earn a commission or bonus, orders must be received, accepted and booked by the last day of each fiscal quarter to count towards quota achievement for that quarter.

- ZOLL Management reserves the right, at any time, to confirm with the customer any and/or all orders prior to order acceptance and review the integrity of Program(s) and/or Standing Orders. Orders that are not within company guidelines may not qualify for sales credit towards quotas or commission earnings.

- ZOLL Management will review any situation where credit/assignment is questionable.

**EXCEPTIONS:**

Territory Manager/Regional Managers are not normally compensated on orders that:

- Are purchased in the U.S. for export.
- Are for customers considered to be a Corporate or House Account. (ZOLL Management will review orders on an individual basis.)
- Are purchased through a Purchasing Authority and may be compensated differently.

## TRADE-IN's/UPGRADES/EXCHANGES

### Prohibited Conduct Relating to Trade-In Equipment:

The allowance offered to customers for their used equipment is a mechanism ZOLL has implemented to assist you in the closing of a sale, getting old equipment off the street, and maintaining high average selling prices for our devices. Trade-in equipment negotiated by you in the process of closing a sale is the property of ZOLL and must be returned to ZOLL after the sale is consummated. Therefore, the unauthorized selling of trade-in equipment is strictly prohibited. Anyone who is caught selling or brokering equipment from a customer will be terminated. As a sales representative of ZOLL, it is expected that you will always act in the best interest of the company.

### Trade-In of ZOLL Products:

A Trade-In Value is valid only if the unit being traded is in good operational and cosmetic condition, and includes all standard accessories such as paddles, patient cables, and the serial number matches the serial number recorded on both the order and authorized Return Authorization.

A Trade-In that is received by ZOLL and is not in working condition will not be considered a valid Trade-In and/or a Trade-In that the customer chooses to keep will require the customer in either case to replace the Trade-In or pay the invoiced order for the Trade-In. The amount of the Trade-In will not be considered as an additional discount to the customer.

ZOLL Management will review customer hardship cases for trades at its discretion.

### Commission Payment relative to Trade-In's:

All re-sales of Trade-In's must be handled through the Equipment/Returns Administrator. The sale of Trade-Ins, Demo Equipment, Refurbished or New equipment to a Third Party Distributor or any other reseller by a field representative is not allowed, such actions are subject to immediate termination.

If ZOLL receives a Trade-In that is determined not pre-approved, e.g., the customer sent in different equipment than what was originally identified as the Trade-In, ZOLL reserves the right to not provide credit to the Field Personnel for that amount.

Commissions on certain competitive Trade-Ins are paid on the resale amount regardless of previous agreements.

## ADJUSTED VALUE FOR INTEREST WAIVER

If Field Personnel agree to extended payment terms with a customer and waive ZOLL's right to collect interest, the revenue for the booked order will be adjusted accordingly and the total commission that may be earned will be calculated based on the adjusted revenue for the order.

## WHEN COMMISSIONS AND BONUSES ARE EARNED AND PAID

Sales commissions and program commissions will be EARNED once there is a Commissionable Transaction.

For capital equipment sales only, once an order is accepted and booked, ZOLL will calculate the anticipated commission to be earned by the Field Personnel. For Hospital and EMS Territory Managers, ZOLL will pay an advance on the unearned commission once the order is accepted and booked equal to 3% multiplied by 50% of the value of the order. ZOLL will pay second advance on the unearned commission once ZOLL ships the order equal to the then-applicable commission rate multiplied by 100% of the value of the order MINUS the amount of the first advance. The first plus the second advance will equal 100% of the payable commission. For Hospital and EMS Regional Managers and Strategic Account Managers, ZOLL will pay a 100% advance on commission once an order is accepted and booked. For Public Safety and Alt Care Field Personnel, ZOLL will pay a 100% advance on commission once ZOLL ships the order. For Military/Government Field Personnel, ZOLL will pay a 100% advance on commission once an order is accepted and booked. The commission is not be earned until there is a Commissionable Transaction (as defined above).

At the end of the month, ZOLL will calculate the Field Personnel's earned commissions for the month on rental agreements and software agreements as well as any advances to be paid on unearned commissions for capital equipment sales. ZOLL will also calculate if any money is owed to Field Personnel for capital sales, if the commissionable revenue for the sale increased after the shipment date. Any payment to the Field Personnel for commission advances for the month will be adjusted by any money owed to ZOLL by the Field Personnel under the Commission and Bonus Guidelines, e.g., for a prior sale involving an unauthorized interest waiver or the cancellation of a capital equipment order prior to shipment or in-servicing. By accepting the commission advances for unearned commissions and/or accepting commissions not actually earned, Field Personnel are agreeing this adjustment based on money owed to the Company by the Field Personnel as described in this paragraph.

ZOLL may adjust the commissions and commission advances to be paid if:

- The sales order is canceled.
- The sales order is adjusted.
- A credit or refund is issued.

House Accounts are not eligible for quota credit or commissions but may be eligible for in-service compensation. In-servicing is the performance of education and training of customer personnel after the delivery of equipment to their site.

Refurbished/demo equipment, non-clinical equipment, free goods or services, trade-in's and/or any other factor affecting the amount ZOLL will receive from the sale(s) are taken into account in the calculation of commissions. Service Parts, Computers, Computer parts and Computer Accessories are not commissionable. Defibrillator Service Contracts, Maintenance Agreements and Extended Warranties do NOT count towards quota achievement but are commissionable.

**BONUSES:**
Bonuses are paid based on the calculation set forth in the Field Personnel's annual Incentive Plan. Bonuses are earned based on Commissionable Transactions. Bonuses are payable in the month following Quarter and/or Year-End and are subject to any adjustments, as defined above.

Bonus payments to employees are based on a full quarter and/or year of service. Bonus payments to employees with less than a full quarter and/or year will be pro-rated based on length of service in the relevant quarter or year.

**DISPUTES:**

It is the Field Personnel's responsibility to examine and notify the Commissions Analyst no later than week one into the next month of any discrepancy in commission payments in order to effect any necessary correction in the next commission run. Any discrepancy in commission payments must be reported promptly so that ZOLL may make appropriate adjustments for any erroneous commission payments. Discrepancies must be reported using the Commissions Reconciliation form.

In the event that a charge back exceeds the commissions and commission advances to be paid, the Field Personnel will not receive a monthly commission payment and the amount owed to ZOLL will be carried over and applied to the next month.

ZOLL reserves the right to demand repayment of moneys owed to ZOLL by Field Personnel at any time. Where allowed by applicable state law, ZOLL will deduct from Field Personnel's commission advances monies due to ZOLL for overpayment.

**ZOLL Management has complete authority to settle any disputes arising from or under this compensation agreement*

**RESIGNATION/TERMINATION**

Final commissions will be calculated and paid according to the following guidelines:

*100% of commissions will be paid once determined and calculable:*

- On any Commissionable Transaction of capital equipment, lease/rental agreement or a software agreement prior to the final day of employment ("Termination Date").
- On any capital equipment sales involving electrode/accessory orders that have shipped prior to Termination Date.

New Field Personnel who are eligible for Commission Supplements will receive payment of their Commission Supplements through the month of termination only. These payments will be made as soon as calculable.

For fair market value (FMV) lease/rental agreements or software agreements, Field Personnel are not eligible for commissions on the unbilled portion of any such agreement as of the Termination Date because the commissions have not yet been earned and do not qualify as a Commissionable Transaction. (See terms for when commissions are earned set forth above.)

Once Field Personnel provides ZOLL with notice of his/her resignation or ZOLL notifies Field Personnel of an involuntary termination, Field Personnel will cease receiving any advances on unearned commissions. Unearned commissions from the last two full months of employment will be held for a period of 120 days (90 days standard waiting period plus 30 days grace period for monthly payroll) following the Termination Date, unless the Capital Equipment Sale becomes a Commissionable Transaction prior to the Termination Date. At the end of the 120 day period, payment will be made in accordance with the guidelines:

*50% of the amount ZOLL calculates would be earned once there is a Commissionable Transaction are paid* on any capital equipment order that was accepted and booked but not shipped prior to Termination Date, adjusted for any charge-backs that occur within 90 days of the Termination Date. Regional Manager needs to notify commission analyst of protected account split within the first week after the Termination Date.

Loyaltyworks Xtra Points need to be utilized within 90 days of Termination Date. If not utilized within this timeframe they will expire.

In the event of a resignation or termination, the Field Personnel are responsible for returning all assigned demo/evaluation equipment, accessories and ZOLL property to the home office in Chelmsford, MA using an RA for the return. If a unit is on loan at a customer site it can be transferred to the new Field Personnel assigned to that customer. To do so, you will need to work this through your Regional Manager. Only after the Demo Coordinator has received written confirmation from the new Field Personnel that they accept financial responsibility, will the unit then be transferred out of the terminated Field Personnel's name.

## SALES FORCE LEAVE COMMISSION POLICY

Employees on an approved leave of absence remain eligible to receive payment of all commissions and/or other payments earned pursuant to the terms of the Commission and Bonus Guidelines prior to the start of the leave regardless of payout date.

The following structure applies to employees during the first 90 calendar days of an authorized leave of absence:

1. Employees remain eligible to earn 100% of all commissions and other payments specified in the Commission and Bonus Guidelines (subject to adjustment as stated above) on any Commissionable Transaction of capital equipment received from an employee's assigned customers during the first 90 calendar days of a leave of absence.

2. Employees who earn a commission or other payment will receive payment of the earned commission or other payment in a manner consistent with the timeline in the Commission and Bonus Guidelines and ZOLL's standard payout practices.

Adjustments to commissions and commission advances will be as set forth above.

## DEMO EQUIPMENT

- All demo equipment will be returned to ZOLL at time of resignation or when otherwise requested.
- If transferring a piece of equipment to another employee, a ZOLL Device Tracking Movement Form must be submitted for release of your responsibility. This must be signed by you and the recipient. Submit completed form to the Demo Coordinator.
- If a piece of demo/evaluation equipment is left at a customer site you must have the customer fill out the ZOLL Loaner Equipment form in order for you to be financially released. Submit completed form to Regional Manager and Demo Coordinator.
- In order to return your equipment to ZOLL you will need to contact the Return Coordinator with a list of serial numbers to obtain an RMA number. ZOLL is not responsible for equipment returned without an RMA number.
- Computer, Printer, Docking Station, and all accessories should be returned to the attention of NA Sales Help Desk under separate cover.

## SAMPLES ORDERING POLICY

In an effort to have better visibility and control over operating expenses, we will be implementing authorization limits related to the ordering of Samples, Giveaways/Donations, and Demo Accessories. Per order limits are based on the list price of the items, and are as follows:

*No Commissions are paid:*

- On any electrode or accessory order (Cath Lab, Battery Replacement Program, etc.) with an order date prior to the Transfer Date.

All charge backs are subject to review by ZOLL Management.

**OPEN TERRITORIES**

When a territory is open and capital equipment orders are generated the following steps under these different scenarios will need to be taken (at no time will Field Personnel receive order dollar credit for an order in an open territory):

- The territory is open and no Field Personnel is to get shipment credit for this order.

  1. The order is entered using the open territory rep number. (No Field Personnel will get order dollar credit or shipment dollar credit. The Director of Sales and Regional Manager will get order dollar credit and commission dollar credit).

- The territory is open and Field Personnel should get shipment dollar credit only.

  Regional Managers are responsible for the following:

  1. Notify the Commission Analyst via Email, documenting the sales order and rep that gets the shipment dollar credit for each specific order. Specify if this rep should receive 100% of the commission. The commission analyst will then handle this adjustment manually. This information needs to be sent by week one, day five of any fiscal month to ensure timely commission payment and meet the change deadline.

- The territory is listed under one rep but two reps should get shipment dollar credit.

  1. An email needs to be sent to the commission analyst when two reps are to be paid shipment dollars for one sales order. Identify the percent amount, 50% credit for the order and 50% credit for the in-servicing. This information needs to be sent by week one, day five of any fiscal month to ensure timely commission payment and meet the change deadline.

  2. Regional Manager will communicate the actual shipment payout to the reps involved the same day the email is sent to the commission analyst.

**MISCELLANEOUS**

**At-Will Employment:** These Guidelines and the Incentive Plan are not employment contracts. Your employment with the Company is "at-will." Nothing in these Guidelines or the Incentive Plan are intended to change or modify your "at-will" status. As an "at-will" employee either you or the Company can terminate your employment at any time and for any reason with or without notice.

**Right to Modify:** The Company reserves the right to adjust or modify the Guideline and the Commission Plan at any time at its sole discretion.

**Entire Understanding:** These Commission and Bonus Guidelines and the Field Personnel's Incentive Plan constitute the entire understanding between the parties regarding the payment of commissions or bonuses and supersede any and all prior agreements or understandings, whether oral or written, express or implied, on such subject matter.

**Choice of Law:** Unless an employee resides in California, these Commission and Bonus Guidelines and the Field Personnel's

Incentive Plan shall be construed under the laws of the Commonwealth of Massachusetts.[1]

## DEFINITIONS FOR GUIDELINE AND INCENTIVE PLANS:

| | |
|---|---|
| *Acceptance Date:* | Date the order is entered into the ZOLL Order Entry System regardless of when the order is received. |
| *Accepted Payment Terms:* | Pre-approved by both a member of Sales Management (Vice President Sales & Marketing, National Sales Manager or Sales Administration Manager) AND Credit (CFO, controller or Credit Manager) may authorize extended payment terms only. |
| *Annual Quota:* | Assigned order dollar objectives based on a full fiscal year. |
| *Approved Pricing:* | Pricing pre-approved prior to quoting for order acceptance. Authorization levels are in accordance with the pricing approval chain guideline. |
| *Field Personnel:* | Territory Manager, Regional Manager, Strategic Account Manager, EMS/Hospital/PS Directors, Director of Government Accounts, Government Sales Manager, V.P., Strategic Accounts. |
| *Charge backs:* | All or part of a commission or bonus that was never earned and will be recouped through adjustments to commissions, commission advances and/or bonuses. |
| *House Account:* | An arrangement negotiated by ZOLL Medical Corporation at the Corporate level that may have multiple ship-to addresses. Also, but not limited to Government Bids/Accounts and Purchasing Authorities which are negotiated through a Procurement Agency. |
| *Assigned Order dollar Objectives:* | Identified in Field Personnel's Incentive Plan. Commissions are paid on rep number based on Total Order. |
| *ZOLL Management:* | President, Senior Vice President Sales, Vice Presidents Sales, Vice President Marketing, Vice President Finance, Director Sales Operations. |
| *Quota: Territory:* | A geographical area, generally defined by three/five digit zip. Exceptions may apply. |
| *Order Dollars:* | The total dollar amount on an order that rolls up into rankings by rep number. The total order dollars on an order can be split by rep. If an order needs to be split customer service must be notified prior to entering the order and the order will need to be entered accordingly. |
| *Shipment Dollars:* | When an order is shipped the total shipment dollars from that order will be paid in the following month's commission advance. |
| *Change Deadline:* | All changes need to be emailed to the Commission Analyst no later than week one, day five of each fiscal month to ensure shipment dollar payout |

[1] For employees residing in California, California law shall apply.